YANCY, Assignee, v. COTHRAN and others.[1]

*(Circuit Court, N. D. Georgia.  May 9, 1887.)*

BANKRUPTCY—ACTION BY ASSIGNEE—LIMITATION.

The complainant, an assignee in bankruptcy, filed a bill, the object of which was to recover against the *feme* defendant certain shares of stock alleged to have been transferred to her in fraud of the rights of her husband's creditors. It appeared that the right of action existed when the assignee was appointed, and that the complainant as counsel had represented one against whom the *feme* defendant had brought suit concerning this stock, and that in that proceeding such information of the transfer had been disclosed which, if diligently pursued, would have led to the discovery of all the facts constituting the fraud, at a period more than two years before the bill in this proceeding had been filed. *Held*, that the suit was barred by Rev. St. U. S. § 5057, which provides that "no suit ＊ ＊ ＊ shall be maintainable ＊ ＊ ＊ between an assignee in bankruptcy and a person claiming an adverse interest touching any rights of property transferable to or vested in such assignee, unless brought within two years from the time when the cause of action accrued."

In Equity.  On plea of statute of limitations.

*Featherstone, Alexander & Wright, W. W. Brooks,* and *Hopkins & Glenn,* for complainants.

*D. S. Printup, W. H. Underwood,* and *King & Spalding,* for respondents.

NEWMAN, J.  This is a bill filed by Yancy, as assignee in bankruptcy of the firm of Cothran & Jackson, composed of H. D. Cothran and J. N. Jackson, against Mrs. Laura E. Cothran, her husband, H. D. Cothran, and others.  The object of the bill is to recover from Mrs. Cothran 232 shares of the capital stock of the East Rome Town Company.  The facts upon which this right to recover is based are substantially as follows, as shown by the pleadings and evidence:  In April, 1874, H. D. Cothran was the owner in his own right of the stock in question.  He had previously, in 1873, failed in business as a member of the firm of Cothran & Jackson.  At the time named, in April, 1874, Cothran transferred the stock to Cothran & Jackson, which firm it would seem was then endeavoring to wind up its old business.  The stock was pledged by Cothran & Jackson to the Bank of Rome as security for the loan of $3,500.  In August, 1874, the note for $3,500 was due, and the firm had not met it. H. D. Cothran was the president and manager of the Bank of Rome, the stock of the bank being all owned, or practically so, by the firm of Ogden & Brower, of New York.  About this time H. D. Cothran went to R. F. Fouche, and stated to him the facts about the hypothecation of the stock; that the debt was due; and that Cothran & Jackson were unable to pay it.  He told Fouche that he and the cashier of the bank, C. O. Stillwell, had tried to sell the stock, but could not get an offer for it.  Stillwell told Fouche the same thing.  Cothran then asked Fouche if he would give his note at 90 days, take a transfer of the stock, and agree that Mrs.

[1] Reported by W. A. Wimbish, Esq., of the Atlanta bar.

L. E. Cothran should have the stock. Fouche agreed to do so, and gave his note in lieu of the Cothran & Jackson note, took a transfer of the stock to himself, and hypothecated the stock as collateral for his note, and signed an agreement in writing that if Mrs. Cothran would pay his note, to transfer the stock to her. The old certificates were taken up by the East Rome Town Company, and new ones issued to Fouche. The stock stood at the time transferred on the books of the company in the name of H. D. Cothran. Fouche had no communication with Mrs. Cothran in the transaction, and communicated only with H. D. Cothran, Stillwell, the cashier, and, perhaps, one Adams. Fouche's wife was a cousin of Mrs. Cothran. About November or December, 1874, Fouche being in the Bank of Rome on other business, Stillwell, the cashier, handed him his note stamped "paid," and said the matter had been arranged. Fouche went into the back room of the bank, and transferred the stock on the books of the company to Ogden, Brower & Co., and it appears from the certificates that about the same time it was transferred by Ogden, Brower & Co. to the Bank of Rome. Fouche testifies that he did not desire or expect to purchase the stock for himself; that he was solvent and able to pay for the stock, and has been solvent ever since; that his principal object in going into the matter was to help Mrs. Cothran. He says his note was a legal note; that he was liable upon it; that nothing existed that would have relieved him from its payment. He also says that when the note was handed him by Stillwell there was on it this entry: "Paid by Mrs. L. E. Cothran." He did not observe this entry at the time, and not until long afterwards, when he attached the note to interrogatories in the case of Mrs. Cothran against Brower. The discount registry of the Bank of Rome shows that after the Fouche note was taken up these 232 shares of the East Rome Town Company stock became collateral in the bank for certain notes of W. S. Cothran, Jr., who was a brother of H. D. Cothran. It continued to run thus on the books of the bank as collateral, with other stock and property, for notes of W. S. Cothran, Jr., down to September 1, 1875, at which time it stood with other stocks as collateral for $10,948.43. The notes seem to have been then extinguished. On May 8, 1876, the stock in question seems to have been transferred by the bank to Brower. In 1878, under an execution in favor of *Forsyth, Administrator,* v. *Cothran & Elliott,* this stock was levied on as the property of H. D. Cothran. A claim was interposed by Brower, and on the trial there was a verdict and judgment for Brower. In August, 1880, Mrs. Cothran filed a bill in equity in Floyd superior court to recover this stock, alleging that about September 1, 1875, she owned this stock, and that it was pledged by her husband to the Bank of Rome for moneys previously advanced to him. She claimed also a large amount of dividends that had been paid on the stock. The case was not tried until January, 1883, when Mrs. Cothran obtained a verdict and decree in her favor for the stock, and for a large amount of dividends, subject to certain credits of amounts for which it had been pledged in bank. It appears of record that Mr. Yancy, the complainant (as assignee) in the case, was attorney for Brower

in the case of Mrs. Cothran against him. His name, with other counsel, is signed to Brower's answer, which was filed December, 1880.

The defendants in this case filed several pleas, and an answer. They set up, in substance, as defenses—*First*, the statute of limitations; *second*, that the facts do not make a case of fraudulent transfer of this stock as against the creditors of Cothran.

It is unnecessary to consider or to determine whether or not the facts established in this case as to the various transfers of the stock, and the circumstances in connection therewith, are fraudulent as against the creditors of Cothran, so as to have authorized a recovery of the same by the assignee in bankruptcy, if it appears that the assignee knew the facts, or had such information that by the exercise of proper diligence he could have known them more than two years before this suit was brought.

Section 5057, Rev. St. U. S., provides:

"No suit, either at law or in equity, shall be maintainable in any court between an assignee in bankruptcy and a person claiming an adverse interest, touching any rights of property transferable to or vested in such assignee, unless brought within two years from the time when the cause of action accrued for or against such assignee."

The courts have, however, ingrafted on this act the recognized rule as to statutes of limitation, that if the facts on which any right of action is based have been fraudulently concealed by the parties in interest, or if the fraud is of such character as conceals itself, the statute will only commence to run from the date of the discovery of the fraud, or of such information as, if diligently followed up, would discover it. *Carr* v. *Hilton*, 1 Curt. 390; *Bailey* v. *Glover*, 21 Wall. 342; *Upton* v. *McLaughlin*, 105 U. S. 640; *Rosenthal* v. *Walker*, 111 U. S. 185, 4 Sup. Ct. Rep. 382.

This bill was filed January 22, 1885. The right of action now claimed, existed in 1875, when the assignee was appointed; so that about 10 years have elapsed since the right of action accrued. Complainant says, however, that the defendants Cothran and wife fraudulently concealed from him the real facts connected with the transfer of this stock, and that the same was only discovered by him within two years before filing this bill in this court.

What are the facts as to Yancy's knowledge? It appears that in 1878 this stock was levied on by an execution in favor of one Forsyth, administrator, against Cothran & Elliott, and that the same was claimed by Brower. Yancy says in his testimony in this case that he attended the trial of that claim case "for the purpose of gaining information as to the stock." This trial resulted in favor of the claimant Brower. The testimony in that case did not disclose Mrs. Cothran's connection with the stock in any way whatever; on the contrary, the testimony of Cothran and others showed regular transfers by hypothecation and sale, as shown on the certificates of stock. It is questionable whether the assignee in bankruptcy can be charged with any notice at that time, in view of the testimony in the case and the result. In *Carr* v. *Hilton*, 1 Curt. 390, CURTIS, J., cites with approval the following language from *Kennedy* v *Green*, 3 Mylne & K. 719, 721, 722:

v.32r.no.11—44

"It is the well-established principle that whatever is notice enough to excite attention, and put the party upon his guard, and call for inquiry, is notice of everything to which such inquiry might lead. When a person has sufficient information to lead him to a fact, he shall be deemed conversant with it."

The same language is quoted with apparent approval in *Wood* v. *Carpenter*, 101 U S. 141. If this rule be strictly enforced, it may be that proof of the fact that Yancy had become suspicious as to the *bona fides* of the transaction about the stock would of itself be sufficient; but I am hardly prepared to so hold. The next Yancy knew of this stock was information that on a division of the assets of the Bank of Rome it was awarded by arbitration between H. D. Cothran and Brower to Brower. But in August, 1880, Mrs. Cothran brought suit to recover this stock of Brower. Yancy, with other counsel, was employed to represent Brower. They investigated the case, and in December following filed Brower's answer. While that bill and answer do not show all the facts in this transaction as fully as they now appear, it did show enough to give any one a pretty fair knowledge of the matter. The bill alleged that Fouche held the stock for the benefit of Mrs. Cothran, and that the same had been held for her benefit since Fouche's transfer. It seems to me that the facts thus disclosed were amply sufficient to put Yancy on inquiry, and that after a reasonable time for inquiry the statute would begin to run.

. But it further appears that October 15, 1881, the testimony of Mrs. Cothran was taken in her case against Brower. Her answers, which were interrogatories in writing, are in evidence here. She testified that she became the owner of 232 shares of stock in East Rome Town Company, in August, 1874. "She bought it from R. T. Fouche. Her brother-in-law, W. S. Cothran, bought it for her. That her title was in writing. It was executed by R. T. Fouche at the time mentioned. It was delivered to her, and had been in her custody ever since." It was not shown when these interrogatories were filed in office, but the presumption is that it was done at the next term of court. It would certainly be fair to Yancy to say that he must have seen them by the spring of 1882. On the twenty-seventh of October, 1881, R. A. Denny was appointed auditor in that case to take account of, and report the amount of, dividends received on the stock, amount due on notes for which it was pledged, etc. In January, 1882, Denny took testimony, and February 22, 1882, made his report. This report contained a transcript from the books of the Bank of Rome, showing W. S. Cothran's notes, and that the stock stood on the books of the bank of Rome as collateral for their payment. So it will be seen that by the spring of 1882, at least, Mr. Yancy must have known every fact in connection with this matter that he knew in January, 1885, when he commenced his suit. Under all the authorities on the subject I think Mr. Yancy's knowledge early in 1882 was sufficient for the period of limitation to commence to run. But it is argued by complainant's counsel that the statute did not begin to run until the verdict in *Cothran* v. *Brower*, 71 Ga. 357. They say that Yancy

had a right to wait until the termination of that suit,—to wait until he could know whether or not her claim would prevail over Brower's. I cannot assent to this view of the matter. There is nothing in the authorities on the subject, so far as I have seen, that would indicate that the assignee had a right to wait until it was determined in another case whether the facts shown were fraudulent or not, and that the statutes would only commence to run after such determination. It appears, moreover, that an amendment was filed by Brower while that case was being argued, denying Mrs. Cothran's right to recover the stock, because her title or interest, if she had any, was obtained through a scheme to defraud H. D. Cothran's creditors. And one of the special issues made thereafter in the case, and which was put to the jury as a question to be answered by them, was whether it was the design of H. D. Cothran, in the transaction with Fouche and Mrs. Cothran, to hinder, delay, or defraud his creditors; and the jury answered that question "that it was not." So that the result of that trial on this point was certainly not such as to charge Mr. Yancy with notice of fraud any further than he had already been. To take the strongest view of this matter in favor of the complainant, I think it must be held that when he had knowledge of the facts on which he now bases his claim to recover, the statute commenced to run against him. And I think that the latest period at which he can be said to have obtained such knowledge would be in the early part of 1882, and nearly three years before he brought this suit. I must therefore sustain the plea which sets up the statute of limitations as a bar to this suit.